UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS DIVISION

C. RAY NAGIN
MOVANT,

V.

UNITED STATES OF AMERICA
RESPONDENT.

Case No. 2:2:13cr00011-001"C" (5)



MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR
CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

C. Ray Nagin, pro se, moves this Honorable Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

PROCEDURAL HISTORY

Nagin is serving a sentence of 120 months of imprisonment, and he is incarcerated at the Satellite Prison Camp-Texarkana, P.O. Box 7000; Texarkana, Texas 75505. Nagin's register number is 32751-034.

On October 4, 2013, C. Ray Nagin was convicted by a federal jury of bribery, "honest-services" wire fraud, conspiracy to commit bribery and honest-services wire fraud, conspiracy to commit money laundering, and filing false tax returns. I was sentenced to 10 years in prison, a forfeiture was imposed in the form of personal money judgment, and was ordered to pay restitution to the federal government for unpaid taxes.

I appealed my conviction January 7, 2016 and the judgment was affirmed. Then on October 3, 2016, petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit was denied.

Now, due to recent rulings in the Supreme Court and District Court, as well as impeachable evidence regarding my key witness against me, I am proceeding with this Habeas Corpus claim. The Arguments follow.

TENDERED FOR FILING

OCT 11 2017

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

1of11

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep_____
___ Doc. No._____

MOTION TO VACATE

Argument 1:

Ray Nagin moves to vacate his convictions first on the grounds that his case is identical to the recent Supreme Court's reversal of the charges against former Virginia governor Bob Mc Donnell (136 S.CT. 2355: Mc Donnell v. United States: April 27, 2016) and the federal appeals court overturning of the conviction of former New York State Assembly Speaker Sheldon Silver's corruption charges (United States v. Silver, 2d Cir., No. 16 - 1615-cr, July 13, 2017). The facts are there was no testimony presented in my case where I attempted to exert pressure on any city worker or appointee to circumvent our strict adherence and use of the state's public bid laws required for all construction projects, particularly any awarded to Frank Fradella's company. There were also no bid protest evidence presented by prosecutors for any of the projects in question. In addition, all other major projects proposed by Mr. Fradella were rejected by me and never came to fruition.

I respectfully remind the court that the prosecutors alleged so-called bribes supposedly happened right after the worst natural disaster in U.S. history, the aftermath of Hurricane Katrina. Over eighty-percent of New Orleans was severely flooded and heavily damaged.

Consequently, I oversaw and was involved in over twenty billion dollars of recovery related construction projects. During most of this time there was more contractor work to be done thant there were available contractors. As noted above, the city was required to bid all of its construction related jobs under the state's sealed bid law. If a qualified firm responded to publically noticed bid specification and were the lowest, responsive bidder they were assuredly awarded the contract without the need for any political influence. As a result there was no need for any bribes. I firmly testified that I did not request nor receive any nor did I make any promises to award work.

TENDERED FOR FILING

OCT 11 2017

U.S. DISTRICT COURT
Eastern District of Louisiana

The three contracts in question to Mr. Fradella's company were all properly bid in full compliance with the law and observed by the City Attorney. In addition, they were are sealed and opened only in public. Once opened, all competing bidders had the right to challenge the winning, responsive low bidder. There were no challenges to Mr. Fradella's company bids.

The fundamentals of my case are practically identical to the Supreme Court's unanimous decision to overturn Mc Donnell and the federal appeal court reversal on Silver. The central issue is did the governor, state assembly leader or myself engage in offcial acts IN EXCHANGE FOR any contractor largess. The answer is no. Mc Donnell and Silver's attorneys successfully argued that they didn't take any formal government action on any contractor's behalf nor did they pressure others to do so. As mentioned above, the prosecutors in my case did not present any city officials or appointees who said I influences anyone to circumvent the state's sealed bid requirements.

Chief Justice Roberts wrote in the Mc Donnell ruling that arranging meetings, hosting events and making calls to subordinates would not qualify as official acts without evidence the governor was applying pressure to achieve a particular result of a pending government action. My only involvement in Fradella's company three contract awards was to sign the contracts as required by our city charter only after they had already gone through a sealed bid process that was reviewed and approved by the city attorney. At no time did I "put my thumb on the scale" to tip these contracts to Mr. Fradella or anyone else. In fact, the city's Chief Administrative Officer and the Director of Public Works both testified to this and neither said I ever pressured anyone to favor any company.

I continue to dispute that Mr. Fradella and I ever came to any agreement of understanding of any quid-pro-quo or demanded any money from him. I also had no knowledge of his many legal problems in multiple states, of his unnecessary behind the scenes schemes or any of his recently revealed

illicit activities.

I do recall a meeting to encourage some lenders to provide a line of credit to his company but stressed that as long as he was the lowest, reponsive bidder there was plenty of recovery work for firms like his. I never made any promises. My attending meetings of this sort were fairly commonplace post-Katrina to encourage much needed investment in the city's recovery.

When Mr. Fradella asked me to call the school board after being disqualified I informed him that was something I could not do and I never made the call. His disqualification did not change.

With regards to the New Orleans Building Corporation I recall making a phone call to the Executive Director to discuss what the developer from Florida, not Mr. Fradella wanted to do. We both concluded that the city could not possibly comply with his audacious request for exclusive reiverfrom access for his development that would deny the public the right to enjoy the river. I informed the developer of my decision and the project never got off the ground and died eventhough it was highlighted during my trial. I also never attempted to get Mr. Fradella's firm "no-bid opportunities" as he claimed. Our city charter prohibits no-bid contracts of this sort, including ones for street lighting. My preference was for contracts to go though a competitive process at the federal, state and/or local level.

Another thing that I testified to was my involvement in my sons' granite company was to invest in it and advise them. This company never made a profit so I did not benefit in any way from it. However, I do recall Mr. Fradella approaching them to buy one of his firm's failing granite operations in Florida that was being liquidated. My sons performed their due diligence and declined.

Next, Mr. Fradella promised to locate an investor to help them expand and even sent them some damaged granite slabs that the Florida company had on their inventory list and could not sell. The prosecutors made a big deal of this and

significantly inflated its value eventhough one of his ex-employees testified that the first shipment was severely damaged. The bottom line is I never promised Mr. Fradella anything in return for arranging an investor for my sons and advised them to be careful and make sure everything they did with Fradella went through their lawyer and was in writing.

Finally, the consulting contract that was the subject of the prosecutors wire fraud charges was entered into AFTER I left office in May of 2010. This agreement was in writing and with a publically traded company. It is my understanding that at that time Mr. Fradella was prohibited by the SEC from being involved with any public company for improperly draining HSOA, Inc. of its cash right before its stock crashed and it went bankrupt. He was not an officer or stockholder of this public company I had the agreement with. Inf fact, the consulting contract was signed by its CEO and not Mr. Fradella. I performed the required work and provided regular status reports.

As stated above, there was no testimony presented at my trial that I influenced any city worker or appointee to circumvent our strict adherence to the state's sealed public bid laws for construction related projects. In addition, none of the proposal Mr. Fradella presented to me were approved and the consulting contract in question was effective after I left office and Mr. Fradella was not a party to it. Therefore, I respectfully ask the court to vacate my convictions.

MOTION TO VACATE

Argument 2:

Ray Nagin moves to vacate his convictions next based upon the grounds that the prosecutors violated the Brady rule, the Jencks Act and the Giglio case for my trial. As background, Mr. Frank Fradella, the government's star witness, representing 16 of 20 counts was facing multiple SEC violations and fraud charges in multiple states before the trial. He had a history of cons and crooked schemes and had been sued by several business partners. He was facing a very long prison sentence. In exchange for his manufactured testimony he received an unusually generous plea deal and only served less than a year in prison. His records were sealed and not made available to my attorneys prior to my trial.

In addition, it has been recently revealed and reported in the press that before, during and after my trial that Mr. Fradella is now facing fraud and money laundering charges related to his bold actions taken right under the noses of federal prosecutors. His pleas agreement and parole are being considered for violation as stated by the U.S. Attorney. See attached exhibit.

If the court recall, the prosecutors and Fradella's attorneys had publically bragged on more than one occasion that the government would never had made their case against me without his testimony. Therefore, the federal prosecutors knew or should have known of Fradella's illicit activities in Florida but illegally withheld this information knowing it would have further impeached him as a witness.

In Brady v. Maryland, 373 U.S. 83, the "Brady rule" states that "Suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment; irrespective of the good faith or bad faith of the prosecutor". My trial attorney informed me he files motions and requested on several occasions that Fradella's files be unsealed, that the "Horn report" and other DOJ

investigative reports be released in an unredacted form. Mr. Fradella's history and current illicit activities clearly demonstrate that if the jury had been made aware of this his credibility would have been impaired to the point where he would have been impeached as a witness. Brady covers situations "when the reliability of a given witness may well be determinative of guilt or innocence". In addition Giglio, 405 U.S. at 154, concluded that "Impeachment evidence, however as well as exculpatory evidence falls within the Brady rule". The question si not whether I would have more likely than not have received a different verdict with the evidence, of which I would have, but whether in its absence I received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Furthermore, the individual prosecutor is PRESUMED to have knowledge of ALL information gathered in connection with the government's investigation.

As clearly stated above, the federal prosecutors clearly violated the Brady rule and its progeny resulting in my not receinving a fair trial. Mr. Fradella would have been inpeached as a witness and would not have been credible and the jury would not have had any confidence in his testimony. Since he accounted for 16 or 20 counts, I repectfully request that the court vacate my convictions.

MOTION TO VACATE

Ray Nagin moves to vacate his convictions next based upon the grounds that because of prosecutorial misconduct that my Sixth Amendment right to competent legal representation was violated. The effect was ineffective assistance of trial counsel and ineffective assistance of appellate counsel. Therefore, there is a reasonable probability that but for the prosecutors and counsels' unprofessional behavior and errors, the result of the proceedings would have been different.

As a backdrop, the New Orleans U.S. Attorney office has been exposed for what one federal judge describes as "grotesque prosecutorial misconduct". Several other federal judges have also vividly described various long running offenses in that office. Their misdeeds include being untruthful to federal judges, directing pre-trail propaganda campaigns and using fake blog names to influence jury pools. This all led to the resignations of this office's top three officials with two out of the three being barred from practicing law.

Due to the fact that my attorneys detrimentally relied upon the prosecutors lawfully disclosing ALL critical information that could have been helpful to my defense this resulted in them being put in the position of rendering me ineffective legal counsel. As a result incorrect laws were cited, jury instructions were not challenged, Brady rules violation motions were not specific enough and were dismissed, no post trial motions to dismiss charges for lack of sufficient evidence or impeachable witness challenges were not filed and the appeals court noted errors of law in the brief that was filed.

Neither appellate public defender sat down with me face to face before filing anything to discuss my case. In addition, a few days before the 5th Circuit's oral arguments my assigned attorney Mr. Silvert and his booss Clude Kelly called me to inform me that Jordan Silvert had accepted a job with the 5th Circuit. They strongly urged me to sign a waiver of conflict of interest so we "wouldn't lose the

great panel of judges" and they repeatedly stressed that Mr. Silvert was the only one in the office who knew my case well enough to argue it. Since I did not have any other options, I reluctantly signed the docutment sent. Right after being denied, Jordan left the office and joined the 5th Circuit. It was never disclosed to me when he started interviewing nor the date of his offer letter. It wasn't longer after that Mr. Kelly received a potential promotion to a higher federal position.

My trial attorney, Mr. Robert Jenkins was widely criticized by legal experts for his mishandling of my case, particularly near the end. I am not sure how many witnesses he interviewed and took depositions from prior to the trial as he repeatedly ran into various intimidation tactics being used by prosecutors on potential witnesses we wanted to call to the stand.

One other thing I should make the court aware of is Mr. Jenkins closing arguments were quite rambling and lacked clarity. His co-counsel Brandon Villavasso was quite upset right after the trial concluded and complained that he had laid out all the key closing arguments but Robert did not use them.

It should also be pointed out that at one point during a recess, one of the prosecutors openly challenged Robert with intimidating comments. He was overheard to say, "You were pretty hard on my FBI witness related to Nagin's taxes, so just how are YOUR taxes!" From that point on Mr. Jenkins just did not perform as well and seemed pretty shook up. As stated above, there was clear evidence that prosecutorial misconduct was fairly pervasive in the New Orleans U.S. Attorney office that violated my Sixth Amendment rights. The full effect of this was it resulted in affecting my trial and appelate counsels reasoning, behaviors which resulted in errors. As a result there is a reasonable probability that the results of my trial would have been very different. Therefore, I respectfully request that the court vacate my convictions.

MOTION TO VACATE

Supplemental Information:

Ray Nagin has also respectfully enclosed a letter dated July 31, 2017 that was sent by me to Attorney Roy Rodney. This attorney has informed my wife that he was interested in assisting. However, there were problems with the mailing. He notified my wife on September 28, 2017, just a few days before the filing deadline that he would not be able to assist me. Therefore, I had little time to put this motion together.

After the Mc Donnell ruling I had been monitoring various related cases and finally in late July the Silver's reversal was published. I now believed I had enough case law to present this motion along with the Fradella developments. This is what I conveyed to Mr. Rodney in the letter.

The follwoing documents are attached for the court's review and consideration:

1. July 31, 2017 letter to attorney Roy Rodney
2. October 3, 2016 letter from public defender Michael Admirand
3. July 19, 2017 Courts Decisions report on New York Assembly Speaker Sheldon Silver's appeal
4. August 18, 2016 letter to public defender Michael Admirand
5. August 26, 2015 Courts Decisions report on New Orleans U. S. Attorney office prosecutorial misconduct
6. February 4, 2017 New Orleans Advocate news article on Frank Fradella's arrest in Florida

Conclusion:

Wherefore, for the reason state above, I respectfully request that my case and convictions be vacated and the charges against me be dismissed. A 2255 motion such as this is reserved for transgressions of constitutional rights and for matters that could not be raised on direct appeal or resulted from new case law and recent Supreme Court rulings.

## CERTIFICATE OF SERVICE

I, C. Ray Nagin, hereby certify that on this 2nd day of October 2017, a true and correct copy of the foregoing was mailed to the Clerk of Court for the Eastern District of Louisiana, having been placed in the designated B.O.P. mailbox located in Texarkana Federal Satellite Camp along with the proper amount of postage.

C. Ray Nagin

_____
signature